UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

QUINDEEL LAMAR MITCHELL,

        Petitioner,                        Civil No. 04-10278
                                                Honorable David M. Lawson
v.

RAYMOND BOOKER,

        Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

The petitioner, Quindeel Mitchell, a state prisoner confined at the Ryan Correctional Facility in Detroit, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, the petitioner challenges his conviction for first-degree home invasion, Mich. Comp. Laws § 750.110a(2), following a jury trial in the Oakland County, Michigan circuit court. He contends that defense counsel was ineffective for failing to challenge unduly suggestive field identifications by two victims. The respondent has filed an answer to the petition contending that the claim lacks merit. The Court finds that the petitioner's claim does not warrant habeas relief. The Court, therefore, will deny the petition.

I.

The petitioner's conviction arises from a break-in at a family home on Canterbury Street in Pontiac, Michigan on November 27, 2000. At trial, homeowner Joan Garry testified that she went to work at 11:00 that evening, leaving her two teenage daughters at home. Her husband and son were not home. When she left for work, her house was in good condition. Around 12:40 a.m., she received a telephone call from a neighbor informing her of the break-in. When she returned home, the back door had been kicked in, the telephone wires had been cut, cable ties were on the floor, and

ceiling tiles in the basement had been removed. Mrs. Garry also testified that the petitioner had played basketball at her house and that she knew him from the neighborhood.

Charles Cook testified that the petitioner was his friend in 2000 and that the petitioner had been to his parents' home on Canterbury on several occasions. Cook said that he had between $2,500 and $3,000 hidden in the basement of his parents' home on November 27, 2000. When Cook returned to his parents' home that evening, he noticed that his basement room was ransacked, that ceiling tiles had been removed, and that his belongings were scattered on the floor. The next day he reported to police that the petitioner had driven by the house on November 27, 2000 but did not stop by to visit as was his usual practice.

Kelli Davis testified that she was at home asleep in her bedroom on November 27, 2000 when she heard a loud banging sound at the back door. She thought it was her brother but instead was confronted by two black males wearing dark clothes, gloves, and ski masks covering most of their faces. One man pulled her out of bed and took her into the living room. She and her sister were tied at the wrists and ankles with cable ties and forced to lay on the floor. One man went into the basement while the other stayed upstairs. Ms. Davis identified the petitioner as the man who went downstairs. She recognized him by his facial expressions and voice. She said that she was familiar with the petitioner because she had contact with him on 10 to 20 previous occasions. While the petitioner was in the basement, the second man sexually assaulted her.

After the men left the house, Ms. Davis and her sister freed themselves. Ms. Davis looked outside and saw the petitioner's green Explorer driving past the house. She recognized the Explorer as the petitioner's vehicle. She and her sister then went to a neighbor's house and called the police. The police later took her to a location a few miles away in Pontiac where the police had stopped the

petitioner in his green Explorer. Ms. Davis recognized the Explorer as the same one which she had seen drive by her house and identified the petitioner as one of the men who had broken into her home that evening. Ms. Davis had no doubt about her identification of the petitioner, which she based upon his voice, eyes, build, and vehicle.

Randi Richardson testified that she was at home with her sister when the break-in occurred. She too was awoken by loud banging and two black males who forced her from her bed and into the living room. She said that the men work dark clothes, gloves, and ski masks, and one carried a duffel bag. The men tied her and her sister with cable ties. One man went into the basement while the other assaulted her sister in the living room. Ms. Richardson heard music outside and was able to look out of the window. She saw a green Explorer with distinctive fog lights, which she recognized as the petitioner's vehicle, driving slowly past the house. The second man then grabbed her and made her lay down on the floor. When the men left the house, she and her sister freed themselves and went to a neighbor's house to call the police. The police later took her and her sister to a location in Pontiac where the petitioner had been stopped in his vehicle. She identified the petitioner as one of the men who committed the break-in. She explained that she initially identified the petitioner as one of the perpetrators based upon his vehicle but testified that she also believed it was him because she recognized his eyes.

Pontiac Police Officer Thomas Martindale testified that he responded to the 911 call that evening. He also took Ms. Davis and Ms. Richardson to a location three or four miles from the home where the petitioner had been pulled over in his green Explorer. At that location, Ms. Richardson positively identified the petitioner as one of the perpetrators. Officer Martindale could

not recall if Ms. Davis was able to make a positive identification because she was upset and subdued as a result of the sexual assault.

Pontiac Police Detective Maurice Martin investigated the crime scene. He observed that the back door of the home had been kicked in, the telephone wires had been cut, and a chair had been pushed up against the house under a window. Inside the house, he saw the cable ties that had been used to tie up the victims and photographed the damage in the basement. Detective Martin took samples from the wires cut outside the home and sent them to the lab for testing. Detective Martin also helped search the petitioner's green Explorer. The police found a white plastic cable tie on the floor, an open box of cable ties, a duffle bag containing bolt cutters, wire cutters, safety glasses, hammers, and some jackets. They also found a pair of gloves between the console and driver's seat, but no ski masks were found.

Police Sergeant Todd Hunt testified that he heard a dispatch about a green Explorer and pulled over the petitioner's vehicle on the evening of the break-in. The petitioner, who appeared nervous, asked if he had been speeding. Sergeant Hunt said this was unusual because most drivers ask why they are being stopped. The petitioner also said that he had just dropped someone off at a nearby apartment. Sergeant Hunt noticed the cable tie on the floor of the vehicle and took steps to determine what had been used to bind the home invasion victims. After additional police officers arrived at the scene and the victims made their identifications, the petitioner was arrested and the vehicle impounded.

Michigan State Police Sergeant David Vroman testified that he was qualified as an expert in tool marks. He tested pieces of wire, bolt cutters, and wire cutters obtained from the Pontiac Police Department and compared known cuts made by the police with samples taken from the scene

of the home invasion. It was his opinion that the bolt cutters found in the petitioner's vehicle made both sets of cuts.

The petitioner did not testify at trial. His defense was that he did not participate in the home invasion and that the victims erred in identifying him. At the close of trial, however, the jury found the petitioner guilty of first-degree home invasion. The trial court subsequently sentenced him as a fourth habitual offender to 10 to 40 years imprisonment.

On appeal, the Michigan Court of Appeals affirmed the petitioner's conviction, finding, in part, that his ineffective assistance of counsel claim lacked merit. *See People v. Mitchell*, 2003 WL 1362191 (Mich. App. March 18, 2003) (unpublished). The Michigan Supreme Court denied the petitioner's application for leave to appeal in a standard order. *See People v. Mitchell*, 469 Mich. 947, 671 N.W.2d 50 (2003).

The petitioner's habeas application was timely filed. He now seeks habeas relief asserting that he was denied his Sixth Amendment right to the effective assistance of counsel because trial counsel failed to seek suppression of the victims' field identifications of him as one of the perpetrators of the crime. This claim was fairly presented to the Michigan appellate courts. The respondent opposes the petition, contending that the petitioner's claim lacks merit and does not warrant habeas relief.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, which govern this case, "circumscribe" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*,

539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11; *see also Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

As noted, the petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the victims' field identifications of him as one of the perpetrators of the home invasion. The respondent contends that this claim lacks merit. The Michigan Court of

Appeals denied relief on this claim, finding that the on-the-scene identification was not unduly suggestive such that counsel was not ineffective for failing to raise a meritless issue. *See Mitchell*, 2003 WL 1362191 at *1.

To prove that trial counsel was ineffective, the petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if counsel's representation falls below an "objective standard of reasonableness." *Id*. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Moreover, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

"[A]n ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001). *A fortiori*, "[c]ounsel could not be unconstitutionally ineffective for failing to raise . . . meritless arguments." *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999).

The record in this case and the federal precedent convinces the Court that the Michigan Court of Appeals's decision is consistent with the pronouncements of the United States Supreme Court and constitutes a reasonable application of federal law to the facts. The petitioner cannot establish that counsel was deficient or that he was prejudiced by counsel's conduct because he cannot show that the identification procedures were unduly suggestive.

Due process protects the accused against the introduction of evidence that results from an unreliable identification obtained through unnecessarily suggestive procedures. *Moore v. Illinois*, 434 U.S. 220, 227 (1977). To determine whether an identification procedure violates due process,

courts look first to whether the procedure was impermissibly suggestive. If so, courts then determine under the totality of circumstances whether the suggestiveness has led to a substantial likelihood of an irreparable misidentification. *Kado v. Adams*, 971 F. Supp. 1143, 1147-48 (E.D. Mich. 1997) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). Five factors should be considered in determining the reliability of identification evidence: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the crime and the confrontation. *Neil*, 409 U.S. at 199-200.

A criminal defendant has the initial burden of proving that the identification procedure was impermissibly suggestive. If a defendant meets this burden, then the prosecutor must demonstrate that the identification was reliable independent of the suggestive identification procedure. *See United States v. Wade*, 388 U.S. 218, 240 n.31 (1967); *Johnson v. Warren*, 344 F. Supp. 2d 1081, 1090 (E.D. Mich. 2004). If a defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicate that the identification is otherwise reliable, no due process violation has occurred. As long as there is not a substantial likelihood of misidentification, it is for the jury to determine the ultimate weight to be given to the identification. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992); *Johnson*, 344 F. Supp. 2d at 1090.

The United States Court of Appeals for the Sixth Circuit has held that bringing crime victims immediately to the scene of the crime to identify a suspect is not impermissible or a violation of due process. *See Bruner v. Perini*, 875 F.2d 531, 534-35 (6th Cir. 1989); *Stidham v. Wingo*, 482 F.2d

817, 818-19 (6th Cir. 1973). Prompt on-the-scene confrontation actually is consistent with good police work and does not offend the principles established in *Wade, supra*. *See Valtin v. Hollins*, 248 F. Supp. 2d 311, 318 (S.D.N.Y. 2003) (citing *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972)). On-scene or field identifications "are essential to free innocent suspects and to inform the police if further investigation is necessary." *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998); *see also Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987) (immediate on-scene confrontations allow identification "before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons").

In the present case, the on-scene identification procedure was not improper. Although the perpetrators wore ski masks, the victims were able to recognize the petitioner's eyes, hear his voice, and observe his build and mannerisms in close proximity for several minutes. The victims also viewed the petitioner's distinctive vehicle near their home at the time of the incident. The victims were certain of their identifications of the petitioner and his vehicle when confronting him at the location where he was stopped by police a few miles from their home that same evening. The victims remained certain of their identification of the petitioner as one of the perpetrators of the home invasion at trial. They testified that their identifications were based upon their observations of his eyes, voice, build, and vehicle at the time of the incident. The victims' in-court identifications of the petitioner were sufficiently reliable to be admissible, notwithstanding the on-scene show-up procedure that was conducted. *See Bruner*, 875 F.2d at 535.

In addition to considering the reliability of the actual identification, courts look to other evidence of guilt to determine whether, if the identification was tainted, permitting the identification

was an error of sufficient magnitude to violate the Due Process Clause because of a substantial likelihood of irreparable misidentification; if not, the error was harmless. *See Robertson v. Abramajtys*, 144 F. Supp. 2d 829, 848 (E.D. Mich. 2001). The prosecution in this case presented other evidence of the petitioner's guilt to support his conviction, including the cable ties and bolt cutters found in his vehicle. The cable ties were similar to those used to bind the victims and the bolt cutters were identified as an exact match to those used to cut the telephone lines to the victims' home. Additionally, the petitioner was stopped a few miles from the scene of the crime driving a vehicle which matched the description of one previously observed near the home. This evidence convinces the Court that any error in the admission of the victims' identification testimony was harmless.

Counsel's failure to move to suppress an allegedly unreliable in-court identification was not constitutionally defective performance since there is no reasonable probability that the suppression motion would have resulted in a decision to exclude the testimony. *See Millender v. Adams*, 187 F. Supp. 2d 852, 868 (E.D. Mich. 2002); *aff'd* 376 F.3d 520 (6th Cir. 2004). Because the Court has determined that the challenged identification testimony in this case was admissible, the petitioner cannot establish that defense counsel erred or that he was prejudiced by counsel's failure to seek suppression of the on-scene identification. *See Bruner*, 875 F.2d at 535. The petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim.

### III.

The Court concludes that the decision of the Michigan Court of Appeals is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court. He is not in custody in violation of the Constitution or federal law.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt # 3] is **DENIED**.

                                                s/David M. Lawson
                                                DAVID M. LAWSON
                                                United States District Judge

Dated:   March 26, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 26, 2008.

                          s/Felicia M. Moses
                          FELICIA M. MOSES